UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BENTON LEO BRAVE HAWK,<br><br>Defendant. | 3:15-CR-30090-RAL<br><br><br>OPINION AND ORDER ADOPTING<br>REPORT AND RECOMMENDATION |

Benton Leo Brave Hawk moved to suppress statements he made to law enforcement officers, arguing that the officers violated Miranda v. Arizona, 384 U.S. 436 (1966) and that his statements were involuntary under the Fifth Amendment. Magistrate Judge Mark A. Moreno issued a Report and Recommendation recommending denying Brave Hawk's motion, and Brave Hawk has now filed objections to that recommendation. For the reasons explained below, this Court adopts the Report and Recommendation.

I. Facts

Tribal police arrested Brave Hawk for allegedly sexually assaulting T.C.F., the eight-year-old daughter of Brave Hawk's significant other. Ex. 1 at 07:50–07:55, 17:40–18:00. Kory Provost, a special agent with the Rosebud Police Department, and Alicia Rowland, a special agent with the FBI, interviewed Brave Hawk while he was in custody at the Rosebud correctional facility. T. 9, 13.[1] Before asking Brave Hawk any questions, Agent Provost read

---

[1] All citations to the suppression hearing transcript use a "T" followed by the page number.

1

Brave Hawk his Miranda rights from an advice-of-rights form. Ex. 1 at 00:23–01:23; T. 15. Brave Hawk acknowledged that he understood each of his rights by writing his initials next to the paragraphs on the form explaining them. Ex 1. at 01:20–02:11; T. 16–17; Ex. 2.

At Agent Provost's request, Brave Hawk read aloud the form's waiver provision, which provided: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Ex. 1 at 02:10–02:28; T. 17; Ex. 2. The following exchange then took place:

> Agent Provost: You agree with that?
> Brave Hawk: Not really.
> Agent Provost: Not really?
> Brave Hawk: No.
> Agent Provost: So, I mean, do you not want to talk to us?
> Brave Hawk: I don't agree with it, but . . . .
> Agent Provost: I mean, it's up to you. (inaudible statement by Brave Hawk). I can't make you, I can't make you do anything. It's up to you. It's your choice. These are your rights. Okay? So either you can talk to us without a lawyer present, like it says, you can stop answering at any time. Or, or not.

Ex. 1 at 02:28–03:04; T. 18–19. Without giving a verbal response, Brave Hawk took the form and signed the signature block below the waiver provision. Ex. 1 at 03:03–03:51; T. 19–20; Ex. 2.

Agents Provost and Rowland then began the interview, which lasted just under one hour and fourteen minutes. Ex. 1. Although Brave Hawk said at the outset that he was "tired" and only "somewhat" awake, Ex. 1 at 07:18–07:40, he never asked to stop or take a break and his answers to the officers' questions were coherent and intelligible, Ex. 1. He repeatedly denied having sexual contact with T.C.F., even when the officers lied and said they found DNA on the child. Ex. 1. Throughout the interview, Brave Hawk asked questions when he did not understand something, including inquiring about what a polygraph was, when he could take one,

2

whether he would be released, and the nature of the tribal charges against him. Ex. 1 at 29:00–35:10. The atmosphere of the interview was calm; the officers did not display any weapons, did not make any threats, and did not raise their voices. Ex. 1; T. 21–22. Nor did the officers make any promises to Brave Hawk to get him to waive his rights or make incriminating statements. Ex. 1; T. 21–22.

A federal grand jury indicted Brave Hawk less than a month later, charging him with aggravated sexual abuse of T.C.F. and child abuse of T.C.F. and her ten-year-old brother. Doc. 1. Brave Hawk moved to suppress his statements from the interrogation, Doc. 24, and the government filed a brief in opposition, Doc. 29. Judge Moreno held an evidentiary hearing during which he received several exhibits into evidence, including an audio recording of the interrogation and a copy of the advice-of-rights form Brave Hawk signed. Judge Moreno also heard testimony from Agent Provost and Agent Rowland.

## II. Analysis

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Brave Hawk objects to the Report and Recommendation, arguing that he invoked his right to remain silent when he said that he didn't agree with the waiver provision; that he did not waive his Miranda rights in a knowing, voluntary, and intelligent manner; and that his statements to the officers were not voluntary. Doc. 37. There is essentially no difference between these arguments and the arguments that Judge Moreno rejected when considering Brave Hawk's motion to suppress. See Docs. 25, 36. This Court has conducted a de novo review of the Report and Recommendation

3

and agrees in all respects with Judge Moreno's reasoning. Nevertheless, this Court will briefly explain why Brave Hawk's objections are overruled.

First, Brave Hawk never invoked his right to remain silent. A suspect who wants to invoke his right to remain silent must "do so unambiguously." Berghuis v. Thompkins, 560 U.S. 370, 381 (2010). When a suspect makes an ambiguous statement concerning his Miranda rights, officers may, but are not required, to seek clarification. Berghuis, 560 U.S. at 381 (explaining that officers are not required to ask clarifying questions when a suspect makes an equivocal or ambiguous statement about the right to remain silent); United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) (noting that it was prudent for officer to ask clarifying question in face of ambiguous statement by suspect concerning right to remain silent); 2 Wayne R. LaFave et al., Criminal Procedure § 6.9(g) (4th ed. 2004) ("[P]olice efforts at clarification remain a *permissible* course of action in cases of actual ambiguity [concerning the right to silence].").

Here, Agent Provost asked Brave Hawk "You agree with that?" after Brave Hawk read the waiver provision, and Brave Hawk responded "Not really." The question and the answering statement by Brave Hawk both are ambiguous. Provost appropriately sought to clarify what Brave Hawk meant by saying "So, I mean, do you not want to talk with us?" Tellingly, Brave Hawk did not respond by saying that he wished to remain silent or that he did not want to speak with the officers. Rather, he said "I don't agree with it, but . . . ." Given the question that Agent Provost had just asked him, Brave Hawk's statement that he didn't "agree with it, but" is hardly an unambiguous invocation of his right to remain silent. Further, this statement itself could reasonably be interpreted in different ways. Finally, the fact that Brave Hawk signed the waiver provision after Agent Provost stressed that it was Brave Hawk's decision whether to speak with

police is inconsistent with Brave Hawk's argument that he was attempting to invoke his right to remain silent.

Second, Brave Hawk's waiver of his Miranda rights was knowing, intelligent, and voluntary. "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right . . . ." Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005). A waiver is "voluntary" if it "was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." Id.

The evidence the government submitted at the suppression hearing establishes that Brave Hawk's waiver was valid. Agent Provost read Brave Hawk his rights and Brave Hawk acknowledged that he understood them by initialing the advice-of-rights form. When Agent Provost asked whether he had any questions about his rights, Brave Hawk said that he did not. Ex. 1 at 01:20–01:25; T. 16. Brave Hawk acknowledged that he understood his rights a second time when he signed the waiver provision. Nothing in the record indicates that Brave Hawk lacked the mental capacity to understand his rights and appreciate the significance of abandoning them. Brave Hawk had a high school education and his behavior during the interview did not suggest that he was mentally impaired or under the influence of drugs or alcohol. Ex. 1. Although Brave Hawk said he was tired and yawned over ten times during the interview, his behavior and ability to respond to questions coherently throughout belies any argument that he was so addled by fatigue that he was incapable of making an informed decision. On this record, Brave Hawk's waiver was knowing and intelligent. See Berghuis, 560 U.S. at 385 (explaining that when a suspect understands his rights, "it follows that he knew what he gave up when he spoke"); North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral

statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . ."); United States v. Hampton, 572 F. App'x 430, 435 (6th Cir. 2014) (noting that although a defendant may have been awake for longer than twenty-four hours, his "coherent and alert nature" in responding to police questions weighed in favor of the district court's conclusion that the defendant's waiver was knowing and intelligent); United States v. Gayekpar, 678 F.3d 629, 634, 639 (8th Cir. 2012) (holding that waiver was knowing and intelligent where police read defendant his rights, defendant orally acknowledged that he understood them, and signed a form waiving his rights and agreeing to be interviewed).

Brave Hawk argues that the waiver of his Miranda rights was involuntary because the officers lied to him about discovering DNA on T.C.F. He contends that this deception is "evidence of coercive conduct by law enforcement." Doc. 37 at 3. This argument lacks merit. The deception did not occur until over fifteen minutes after the waiver and it did not concern the nature of Brave Hawk's rights or the consequences of waiving them. Ex. 1. Brave Hawk has failed to explain how the deception influenced his decision to waive his rights or kept him from asserting his rights later in the interview. Whatever limited relevance the deception had to Brave Hawk's waiver decision, it is not enough to establish that the decision was involuntary when the officers did not engage in any other coercive or deceptive conduct.

Brave Hawk also argues that his fatigue during the interview made the waiver invalid. Fatigue is a factor that courts must consider but it does not automatically render a waiver involuntary. United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008). Rather, the test is whether the impairment "caused the defendant's will to be overborne." Id. (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)). Agent Provost testified that although Brave Hawk yawned during the interview, T. 23, there was never any indication that he was too

tired to continue, T. 24. The recording of the interview provides ample support for Agent Provost's testimony; Brave Hawk was alert and coherent throughout the entire process and he never asked for a break or said that he was too tired to go on. Ex. 1. Other than his yawning and statements that he was tired, Brave Hawk points to nothing in the record indicating that his state of fatigue was so severe his will was overborne. The Eighth Circuit has upheld a district court's conclusion that a waiver was voluntary under circumstances much more extreme than a defendant saying he was tired and yawning several times. See Gaddy, 532 F.3d at 788–79 (finding no error in district court's determination that defendant's waiver of his Miranda rights was voluntary because defendant appeared awake and coherent and did not tell officers he was tired or intoxicated, even though defendant had not slept the night before and had consumed pain relievers, muscle relaxants, alcohol, marijuana, and cocaine within twenty-four hours of executing the waiver); United States v. Contreras, 372 F.3d 974, 977–78 (8th Cir. 2004) (upholding conclusion that a suspect who used methamphetamine the night before and marijuana the day he waived his rights consented voluntarily because police officers testified that he "appeared sober and in control of his facilities"); Casal, 915 F.2d at 1229 (affirming district court's decision that defendant who had recently used methamphetamine and had not slept for five days was capable of making a voluntary waiver where police testified they were unaware of these impairments and that defendant did not act intoxicated); see also United States v. Fast Horse, No. 12-cr-30034-RAL, Doc. 79 at 4 (finding that waiver was voluntary despite suspect yawning several times during interview). In any event, "[e]ven if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect . . . a Miranda waiver will not be invalidated on that basis if there is no evidence of police coercion." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011). There is no such evidence of coercion in the present case.

7

Finally, Brave Hawk's statements during the interview were voluntary. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 483–84. (alteration in original) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)). Brave Hawk nevertheless contends that the officers' use of deception during the interview, when combined with his fatigued state, rendered his statements involuntary. The same analysis concerning whether a defendant's waiver of his Miranda rights was voluntary applies to determine the voluntariness of a defendant's statement under the Fifth Amendment. See United States v. Makes Room for Them, 49 F.3d 410, 414 (8th Cir. 1995). As explained above, the atmosphere of the interview was calm, the officers never threatened Brave Hawk or made him any promises, and Brave Hawk was alert and engaged throughout the entire process. The officers' use of deception did not transform the interview into a coercive situation that was sufficient to overbear Brave Hawk's will. See Fast Horse, No. 12-cr-30034-RAL, Doc. 79 at 6 (holding that deceptive tactics by police officer did not render statement involuntary where deception had no effect on defendant and the atmosphere of the interview was not coercive). The officers only discussed DNA briefly and their deception had essentially no effect on Brave Hawk. He continued to maintain his innocence and even agreed to take a polygraph, saying that he knew he would pass. Ex. 1 at 19:00–30:20. Because the record establishes that Brave Hawk's statements were voluntary, his objection to the contrary is overruled.

## III. Conclusion

For the reasons stated above, it is hereby

ORDERED that the Report and Recommendation, Doc. 36, is adopted in full. It is further

ORDERED that Brave Hawk's objections to the Report and Recommendation, Doc. 37, are overruled. Finally, it is

ORDERED that the Motion to Suppress, Doc. 24, is denied.

DATED this 26th day of January, 2016.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE